Scott Hunt appearing on behalf of Plaintiff Appellant, Ms. Clark. This Oregon wrongful constructive discharge claim based upon opposing the illegal sale of alcohol involves two disputed material facts, when plaintiff resigned and why, and the lower court erred when it resolved each of those disputed facts in defendant's error. First, this court needs to determine when plaintiff resigned, because that determination affects the analysis of the why question. Defendant argues it accepted plaintiff's resignation the morning of October 8th when plaintiff presented her resignation letter to Mr. Gallegos. They're answering brief at page 7. Defendant relies essentially on the findings and recommendations produced in this case, which concluded that Ms. Clark offered her resignation to Safeway and that Safeway accepted it. It was unequivocal. It was a done deal that morning. But this court knows not to rely on the findings and recommendations or the facts summarized within that document. We must look to the record. The defendant in this case didn't do that in its briefing, and it doesn't do that because the record isn't consistent with it being accepted, the resignation being accepted that morning. If we look at the record and we turn to plaintiff's depositions, it's at excerpts of the record, page 36. Wait, are you telling us we're supposed to ignore the findings of the district court? No, I'm not. I'm saying don't rely upon them being accurate. You have to look to the record itself. No, don't you have to show they're clearly erroneous? It's a summary judgment. Summary judgment, de novo. Okay, okay, I see what you're saying. I'm sorry. I'm sorry.  it is on summary judgment. It is de novo. You need to look at the record itself, despite defendants having cited to the findings and recommendations to support its argument in the briefing. If we look to the records, the excerpts of the record, at page 36 and page 42, that October 8th meeting with Mr. Gallego is testified to, and it makes it clear in that testimony that Mr. Gallego wanted Ms. Clark to continue her employment. Did he tell you, this is on page ER 36, page 66 and 67, did he tell you he wanted you to continue working at the store? Yes. Previous question, did Mr. Gallego assure you that it would not affect your ability to proceed with the RLD program, that's the management training program that my client had wanted to get into when she was reemployed at Safeway? And she says, I left the office, and his feeling was that I understood him to feel I was able to do just that, continue with the RLD. What was the basis of her assertion that he knew that if she couldn't continue in the training program, the management training program, she would leave? That goes to, there's a number of places that presents the evidence that defendant knew. The clearest statement is in plaintiff's affidavit, excerpt of the record number 19, where she states they knew. Well, is she a mind reader? Well, no, but there is that evidence in the record that they knew. It is supported by the- Mr. Gallego is the individual that takes the action, and Mr. Gallego knows that a number of things. The primary fact goes to the continuation of the discussion the morning she tries to resign. You look at page ER 42- Well, he knew she applied for the management job. Right. He cared about it, but the question that Judge Hunk is asking is that her primary assertion is that they knew that the only reason I took this job was so I could be in management. I believe there's evidence to support that, but I don't think we have to say that they knew the only reason she took it was to be in management. If we go to the testimony, again, page 42, where she says, he was very extremely in favor of continuing me into the management program, making comments that were positive in nature and strongly urging me to continue. And then it continues, and what did you say in response in her testimony? I told him I appreciated that, and I would still have to consider the management position at that time. So what we have is when she leaves the meeting with Gallegos, she has presented the letter of resignation. He has said, I want you to continue working here. This evaluation that you're so concerned about won't affect your ability to participate in management. And she says, as to that position, that management position, I will consider that. So she's resigned, unless that position exists. The language is he's in favor of her continuing into the management program, and she would consider it's awkward language because she changes program to position, but the program leads to a position. The testimony from Gallegos' boss is that after the six-month training program, you become a first or second assistant manager. So it's a training program automatic position. When was the phone call from Gallegos telling her that she was no longer, because of her scolding her supervisor in front of a customer, she was not management trainee material? That evening, October 8th, she presents her letter of resignation. He says stay. That afternoon, he finds about the voice message that she has gone to his boss and said there's illegal activity, I'm going to the OLCC. That evening, 6.30, when she's at home, he calls and says, as to the management position that's gone, that's not going to work because you've talked to my boss and you told him about this. Because you're relying on constructive discharge, right? Right. And she wasn't constructively discharged or discharged or anything else from the job she had. She presented a resignation due to her poor evaluation. That becomes a pending resignation. You're not claiming that that was an intolerable work condition? Not in and of itself. It contributes to it. But when that resignation is put on hold, it's pending, you can continue in the management position. Then there's another revelation. The revelation is, oh, wait a minute, you went to my boss. You've gone to the OLCC about this very same issue, illegal sale of alcohol. Now it's not available to you. But when he called her, when he called her, when Lagos called her. Yes. You didn't tell her, I'm now accepting your resignation because of what you did. Well, in effect, he is. Why? Because she has resigned except as to that position. But there was no position. Except as to, call it position or program. She wasn't in the program yet. She hadn't been accepted in the program. The only thing that they could have been saying is you should keep your job because you have an application for the program and you have a good application because you're very smart. And so you'll probably get into the program and you're probably in the long-run management position. But still, the only thing anybody was ever talking about was her job, her non-management job. It was the only thing she had. At the time of the resignation, looking at the conversation on page 42, in favor of plaintiff, it is about continuing in the program. Whether that's yesterday, today, or tomorrow, I don't think changes the fact that he knows that that is the only reason she's continuing, that she has resigned her employment and the only reason she is considering not resigning is his representation that she can either continue yesterday, today, or tomorrow with the program. And he removes that from her entirely in the phone call. There's no question he eliminates that possibility. It's subjectively intolerable to her to continue working as a cashier with no hope of getting back into the training program. It's not just subjectively because... Assuming, let me ask the question. Okay. Assuming that she has this expectation, or whatever it is, that she might become a trainee, a management trainee, and she resigns, then she's told that her management trainee expectation is no longer valid. But she's still asked to stay on at Safeway as a cashier. Now, what is intolerable about that? What's intolerable about that is that the standard is a reasonable person in her position. And her position is the only reason I'm here is for the management position. I had resigned back in the spring. I have reapplied solely for the management position. I have resigned when you've given me an evaluation that criticizes me for opposing illegal conduct. And you have assured me that this evaluation won't affect my ability to continue in this program. I say, okay, as to that option, I will consider that. And you eliminate that option when you find out I went to your boss and the OLCC about the same thing. They know that the only reason she hasn't resigned effectively is to continue, whether she had already started it, whether the decision had been made that day or the decision was to be made tomorrow. Yes, I know. May it please the Court, Brad Tellem, on behalf of Defendant Safeway. I am at least somewhat reluctant to say anything because the Court has addressed many of the issues that I wanted to. Just be brief. I will. I'll do my best. I would point out just a couple of facts that I think are important. In this case, the events that occurred, the critical events, really all of which were undisputed, occurred in a very short period of time. We have the event relating to the sale of alcohol in an earlier time, but then two months later is when the review happens. Is there often wrongful discharge statute or non-statute for a cause of action limited to discharge? Yes. What if she had said, what if her cause of action was, well, I understand you didn't discharge me for this reason, but you did in fact bar me from your management position? Would that be a problem? No. There must be a discharge, and it can be, as I think the briefing explains, it can certainly be constructive in nature. You don't, I mean, you can have the. . . But the failure to promote somebody. There is no failure to promote cause of action in Oregon that I'm aware of. Interesting and weird. Well, and I don't think this case has ever been argued, frankly, as a. . . Well, I know it hasn't, but as I sit here thinking about it, I'm thinking that's really what we have here. Yes. I wouldn't disagree that that is an argument that could be made. I'm not sure, thinking about the facts, that it ultimately would get there because, again, it was a. . . that plaintiff hoped to get into ultimately, and so I think there may be some issues there. So there's a difference between not, between making an adverse employment decision about something, like not promoting or reassigning or something like that, that could be the grounds for a discrimination claim in making one's position so intolerable that you constructively discharge them. Absolutely. And I think the difference here, in point of fact, is that on any number of levels, the court could look and say there's no facts to support this particular prong, and they have a tendency to overlap a little bit. The intolerability of the conduct goes at some level to, obviously, the objective reasonableness of what the plaintiff, someone in the plaintiff's position would have believed, but it also carries over into the discussion that the court just had relating to the knowledge of the defendant, of the fact that the plaintiff claims to have had this job solely for the purpose of. . . Right. And I don't think that you would have a situation. . . I mean, I think that cuts both ways. I think it cuts both with respect to the intolerability of the conduct, whether or not it was reasonably intolerable, objectively reasonably intolerable under the circumstances, as well as to the intent, you know. Well, wouldn't you think that if somebody, you know, came in the door and said, you know, I told everybody that I'm taking this job only because I want to be a bench recursion, and wouldn't that be part of her circumstances? Certainly. But that's not the facts, I don't think, in this case. I think the only evidence that we have is that the only part of that, the only reason I have this job happens only after the statement is made by the Safeway manager that she couldn't go forward into that particular program. Well, I hate hypotheticals, but let me ask you one anyway, because I'm very familiar with Safeway. There are a lot of Safeway beggars and checkers who are doing this in order to pay for education. And if the employer knows that someone is working weekends and afternoons in order to pay for going to law school at night, and the employer says, okay, we are now going to have to work at night, isn't that making the situation intolerable? Potentially. For that person. Under those facts, yes. Part of the, I think some of the difficulty is. You're saying this is not that case. Yes. Because you don't, one, you don't have the knowledge, and two, in effect, the plaintiff has conceded away the lack of intolerability before this later event. That's why I say there's plenty of places for the court to jump off here. The first place is when she walked into the office that morning and said, I quit. Case is over. Was there any objective intolerability before that time? She basically says, no, case is done. The next jumping off point is then, well, if we're going to. What she said at that point was not, all right, I'll think about it, but essentially, I'll think about thinking about it. Right. That's our position. It was, it wasn't, I'm not resigning. It was, let me consider this a little bit more. And it might almost be another situation if you had events conspiring several weeks later. You know, let's say this resignation issue was open for some longer period of time. But you're really dealing, I mean, you can look at this another way, and maybe this is not my job on summary judgment. But, you know, Safeway does a nice thing and says, we like you. We want you to stay at this job. We want you to be a part of the. I'm repeating the time frame again. That happens when? October 8th. And then. What time of day? Morning, I believe. I wouldn't, I'm not going to swear to that. But within eight hours, I think, is the evening phone call. Somewhere in that range. You know. She's told the management is out in the evening. Out of the question. Correct. And she's had the whole day. Yes. To consider it. Right. Exactly. But, you know, you have someone who resigns. The company basically says, please stay. We want you to stay. And they still want her to stay. They say, maybe not this management program, but we want you to stay as an employee of Safeway. Those are not the kind of objectively unreasonable circumstances and intolerable circumstances that would justify a wrongful, constructive discharge in this context. Moreover, you have the intent standard, and I think that all goes back to the knowledge element. Unless the court has additional questions. Thank you. Thank you, counsel. The case just argued is submitted for decision. That concludes the court's calendar for today. And the court's game adjourned. All rise.
judges: Schroeder, Goodwin, Berzon